**Sylvia EVANS, etc., Plaintiff,**

v.

**CITY OF CHICAGO, et al., Defendants.**

**Bertha BALARK, et al., Plaintiffs,**

v.

**CITY OF CHICAGO, et al., Defendants.**

**Curtis COLLUM, etc., Plaintiff,**

v.

**CITY OF CHICAGO, et al., Defendants.**

**Nos. 77 C 4119, 79 C 1939 and 79 C 2493.**

United States District Court,
N. D. Illinois, E. D.

Aug. 15, 1980.

Edward T. Stein and Mary Rita Luecke, Singer & Stein, Chicago, Ill., for plaintiffs in 79 C 1939 and 79 C–2493.

**792**

Robbins, Coe, Rubinstein & Shafran, Ltd., Sigmund Chavis, Chicago, Ill., for plaintiff in 79 C 2493.

John Bernard Cashion, A Professional Corp., Chicago, Ill., for plaintiff in 77 C 4119.

James Maremont, Asst. Corp. Counsel, Robert Orman, Chicago, Ill., for defendants in 79 C 2493.

William R. Quinlan, Corp. Counsel, Chicago, Ill., for defendants in all cases.

## MEMORANDUM OPINION

GRADY, District Judge.

Plaintiffs have brought these § 1983 actions against the City of Chicago challenging the City's practice of delaying the payment of judgments obtained against it.[1] Plaintiffs in *Evans* and *Balark* are original judgment[2] holders—that is, they have not assigned their judgments or obtained them by assignment—whereas plaintiff in *Collum* is an assignor—that is, he assigned his judgment at a discount. On May 1, 1979, we held that the complaint in the *Evans* case stated a cause of action under § 1983 and on January 2, 1980, certified a class. Defendants have filed motions to dismiss in *Collum*

and *Balark.* We will deny those motions and certify separate classes in both cases.

### The Collum Case

On January 23, 1976, plaintiff Collum and the City of Chicago and four police officers entered into a Stipulation as to Judgment for $17,500.00 in plaintiff's § 1983 action for an alleged beating by the police. Collum Complaint ¶¶ 6, 7. This court (Austin, J.) thereafter entered a judgment order in accordance with the settlement and on February 6, 1976, the defendants signed a waiver of appeal. Plaintiff alleges that the judgment was then placed on a "waiting list" and that, at the time his judgment was entered, it was the practice and custom of the City to withhold payment of tort judgments[3] up to two years. The current waiting period is allegedly four years. Complaint at ¶ 11.

The applicable statute for the payment by the City of tort judgments against it is Chapter 85, §§ 9–102, 9–104, Ill.Rev.Stat. Section 9–102 provides:

A local public entity is empowered and directed to pay any tort judgment or settlement for which it or any employee

---

1. The jurisdictional basis is 28 U.S.C. § 1343(3) (the jurisdictional counterpart to 42 U.S.C. § 1983), § 1343(4) and the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202. While plaintiffs have also invoked federal question jurisdiction under 28 U.S.C. § 1331, stating that the amount in controversy exceeds the $10,-000.00 minimum provided in § 1331, it is now well established that for a civil rights action under § 1983, no amount in controversy is required. See 28 U.S.C. § 1343(3); *Lynch v. Household Finance Corp.*, 405 U.S. 538, 92 S.Ct. 1113, 31 L.Ed.2d 424 (1972); 13 Wright & Miller § 3573 at 501.

2. For the sake of convenience, we will from time to time use the term "judgment" to include a settlement with the City. The statutory scheme at issue in this case applies to judgments or settlements. See ch. 85, § 9–104, Ill.Rev.Stat., *infra*.

3. Our comparison of the facts in *Collum* with the text of § 9–104 suggests a question of statutory construction which was not raised by the parties here. The statute refers to the payment of a "*tort* judgment or settlement." (emphasis supplied). The question then is whether a § 1983 action—the basis of the underlying

suits brought by plaintiffs Collum and Balark against the City, which was settled—is a *tort* settlement within the statutory meaning. We believe that it is, for two reasons. First, in applying the statute, the City seems to have included civil rights actions within the definition of tort. The City has made no representations to the contrary. Second, we believe that the word "tort" is broad enough to reach a § 1983 judgment or settlement. The acts alleged in *Collum*—the beating and verbal abuse of plaintiff by four police officers—are tortious in nature. Courts in other contexts have interpreted the word tort in a statute to include § 1983 actions. See, e. g., *Overby v. Johnson*, 418 F.Supp. 471 (E.D.Mich.1976) (construing phrase "action in tort" in Michigan long-arm statute as including § 1983 actions); *Mendelkorn v. Patrick*, 359 F.Supp. 692 (D.D.C.1973) (same as to analogous District of Columbia long-arm statute); *see also Carey v. Piphus*, 435 U.S. 247, 253, 98 S.Ct. 1042, 1046, 55 L.Ed.2d 252 (1978) (stating that the legislative history of § 1983 demonstrates that it was "intended to '[create] a species of tort liability' " in favor of persons deprived of constitutional rights).

while acting within the scope of his employment is liable in the manner provided in this Article. A local public entity may make payments to settle or compromise a claim or action which has been or might be filed or instituted against it when the governing body or person vested by law or ordinance with authority to make overall policy decisions for such entity considers it advisable to enter into such a settlement or compromise.

Section 9–104 provides:

(a) If a local public entity does not pay a tort judgment or settlement during the fiscal year in which it becomes final and if, in the opinion of its governing body, the unpaid amount of the tort judgment is not too great to be paid out of revenues for the ensuing fiscal year, the governing body shall pay the balance of the judgment during the ensuing fiscal year.

(b) If the local public entity does not pay the tort judgment or settlement during the fiscal year when it becomes final and its governing body is of the opinion that the unpaid amount of the judgment or settlement is so great that undue hardship will arise if the entire amount is paid out of the revenues for the ensuing fiscal year, the governing body shall pay the judgment or settlement, with interest thereon, in not more than 10 annual installments. Each payment shall be of an equal portion of the principal of the tort judgment or settlement. The governing body, in its discretion, may prepay any one or more installments or any part of an installment.

Plaintiff in *Collum* alleges that in reliance upon the City's policy and practice of delaying payment of judgments, he assigned his judgment on February 16, 1976, (Complaint, Exhibit B) at a discount of 13 per cent. The judgment was paid to the assignee at the face amount of $17,000.00 plus interest thereon. The City's practice ·of delaying payment of judgments has allegedly created a "discounting business which in essence preys most heavily upon the poor, the injured and minorities." Complaint, ¶ 19. Presently, assignors are dis-

counting their judgments at a rate of 20 per cent.

Plaintiff's theory of recovery is based upon due process and equal protection arguments. He also seeks certification of a class of assignors under Rule 23, which we will discuss later. In Count I of the two-count complaint, plaintiff alleges that he had a right of entitlement to prompt payment of the judgment and that the City's policy and practice of delay is a deprivation of that interest without due process of law. But for this unconstitutional policy and practice of delay, plaintiff would not have assigned his judgment and suffered the discount amount. The complaint seeks a declaratory judgment that § 9–104 is unconstitutional as applied and on its face in violation of the due process clause and also seeks compensatory damages plus attorneys fees and costs.

In Count II of the *Collum* complaint, plaintiff alleges that the City pays non-tort judgments (e. g., contract, eminent domain) promptly while it delays payment of tort judgments. It is alleged that this practice violates the equal protection clause.

### The Balark Case

In 1977, plaintiffs in *Balark* brought a § 1983 action against Chicago police officers. The parties settled that case, each of the four plaintiffs receiving $4,250.00. By stipulation, this court (Perry, J.) entered a judgment order in the action on April 10, 1979.

On May 14, 1979, the Balarks filed the § 1983 action presently before us. In Count I of the two-count complaint, plaintiffs allege a "practice, custom and policy of [defendants] to arbitrarily and capriciously, in violation of plaintiffs' rights to substantive and procedural due process, withhold payment of tort 'judgments' for up to four years." Balark Complaint, ¶ 10. Further, plaintiffs claim a "right of entitlement" to prompt payment of their judgment (¶ 13) and allege that the practice, policy and custom of withholding payment of judgments and paying only 6 (if judgment is against City only) or 8 per cent simple interest

during this delay is a taking of plaintiffs' property without due process of law. ¶ 16. It is also alleged that the policy of delay has, in effect, created a discount business where judgment holders sell their judgments at upwards of a 20 per cent discount in order to receive present payment. ¶¶ 14, 15.

Whereas the *Collum* complaint challenges the constitutionality of § 9–104 on its face and as applied, the *Balark* complaint does not challenge the facial constitutionality of the statute. The due process attack in *Balark* is that the City's policy and practice of delay simply ignores the statute.

In Count II, plaintiffs allege that tort judgment creditors are placed on a four year "waiting list" whereas "other" judgment creditors (*i. e.* contract, eminent domain) are paid promptly. ¶¶ 19, 20. Plaintiffs challenge that practice as violating the equal protection clause of the Fourteenth Amendment.

The following relief is requested in *Balark*: (1) a declaratory judgment that defendants' denial of payment violates the due process and equal protection clauses; (2) an injunction compelling defendants to pay the judgments; (3) certification of a class under Fed.R.Civ.P. 23(a) and (b)(1) and (3); and (4) compensatory damages and attorneys fees and costs.

### Preliminary Arguments in Motions to Dismiss Collum and Balark

Defendants raise a variety of arguments in support of their motions to dismiss: (1) lack of standing; (2) waiver of right to prompt payment; (3) abstention; (4) Comptroller Burris is an improper party defendant; and (5) constitutionality of § 9–104 and defendants' payment policies or practices. We will consider the constitutional questions later. The questions of waiver,

abstention and propriety of the Comptroller as a defendant are common to the *Collum* and *Balark* motions to dismiss, and thus our rulings on these questions will be dispositive of both cases. The standing issue is unique to *Collum*.

*Standing of Plaintiff in Collum.* Defendants argue that plaintiff Collum lacks standing to bring this action because he has assigned his judgment and "received satisfaction of his claim." Motion to Dismiss at 2. Since the claim has been satisfied, so the argument goes, plaintiff has no standing to complain of delay in payment of judgment.

▬ The relevant inquiry to determine standing is whether plaintiffs have alleged an actual or threatened injury to themselves that is likely to be redressed by a favorable decision. *Simon v. Eastern Ky. Welfare Rights Organization*, 426 U.S. 26, 37–39, 96 S.Ct. 1917, 1923–1924, 48 L.Ed.2d 450 (1976); *American Medical Ass'n v. Matthews*, 429 F.Supp. 1179, 1189 (N.D.Ill.1977). They need not show that that decision will be in their favor. *Id.* The *Collum* complaint clearly alleges an actual injury to assignors who, because of the City's policy and practice of delay, discounted their judgments and thereby received less than they would have absent the practice of delay. Defendants' argument that the assignors' claims have been "satisfied" ignores the fact of the substantial discount suffered. We hold, therefore, that plaintiff has standing to bring this action.

*Waiver.* In further support of its motion to dismiss in *Collum* and *Balark*, defendants argue that in the settlement agreements with the City, plaintiffs waived any right to prompt payment of the judgments.[4] The focus of this argument is on Paragraph 9 of the Stipulation which Collum signed on January 23, 1976. A substantially similar

---

4. In the *Collum* complaint, plaintiff alleges: "Upon information and belief and in furtherance of its unlawful policy and practice . . ., the Defendant City of Chicago routinely includes paragraph 9, or a reasonable facsimile, in all Stipulations for Judgments of this kind." *Collum* Complaint at ¶ 12. Although many plaintiffs in the earlier *Evans* case obtained

their underlying judgment against the City via settlement, the waiver issue has not been litigated in *Evans*. Although we cannot say with certainty at this point, this may be because at the time the *Evans* complaint was filed in 1977 (two years prior to the *Balark* and *Collum* filings) the City was not using the waiver clause in its settlement agreements.

clause was in the agreement signed by the Balarks.[5]

9. Plaintiff, upon advice of his counsel, is aware of the manner, method and means of the payment of the judgment herein (including the delay in time of such payment of approximately two years), is satisfied with the same; and is further satisfied with the sum of money indicated in the Stipulation and Judgment. Further, plaintiff understands that such sum of money is a total settlement of any and all claims he has, or may have in the future, arising out of the incidents which were the subject matter and/or basis of the litigation, against the City of Chicago, its officers, officials, agents, servants and employees.

Complaint, Exhibit A.

"While the Supreme Court has recognized that one may voluntarily relinquish constitutional rights, it has also required that such relinquishments be entered into voluntarily under all of the circumstances presented." *Boyd v. Adams*, 513 F.2d 83, 87 (7th Cir. 1975); *Schneckloth v. Bustamonte*, 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973); *D. H. Overmyer Co. v. Frick Co.*, 405 U.S. 174, 92 S.Ct. 775, 31 L.Ed.2d 124 (1971). A waiver must be "voluntary, knowing, and intelligently made"—"an intentional relinquishment or abandonment of a known right or privilege." *Overmyer, supra*, at 185–186, 92 S.Ct. at 782–783. The Supreme Court has also indicated that inequality of bargaining power is a factor for consideration in determining the validity of a waiver. *Id.* at 186, 92 S.Ct. at 782–783. We must "indulge every reasonable presumption against waiver." *Aetna Insurance Co. v. Kennedy*, 301 U.S. 389, 393, 57 S.Ct. 809, 811, 81 L.Ed. 1177 (1937).

We believe that plaintiffs may be able to show that they did not, under all the circumstances, voluntarily relinquish their right to bring a § 1983 action challenging the constitutionality of § 9–104 and defendants' payment practices. Plaintiffs might demonstrate that the circumstances surrounding paragraph 9 involved an inherently coercive situation. Had plaintiffs chosen not to sign the settlement agreement, they would have been faced with the delay and expense of litigation *in addition to* the delay in payment following judgment. The settlement would at least expedite the procurement of the judgment—an alternative which might seem especially compelling in light of post-judgment delays of at least two years under § 9–104(a), 10 more years if the installment plan of subsection (b) is used, or an indefinite period of delay if the City unlawfully ignores the statute. Since plaintiffs may show that paragraph 9 put them to the choice of either (1) not settling and thus incurring additional substantial delay or (2) waiving their right to sue the City to obtain full satisfaction of their judgments, we cannot conclude at this stage of the proceeding that the element of voluntariness necessary for a relinquishment of constitutional rights is present here.

Plaintiffs may also be able to show an inequality of bargaining power between plaintiffs and the City. The alleged marginal economic circumstances of many successful plaintiffs against the City (see *Collum* Complaint ¶ 19) may increase the incentive to bargain away money as well as rights for the sake of quick payment. That incentive is alleged to account for the high numbers of plaintiffs who have settled, or sold their judgments at a discount, or both.

*Abstention.* With respect to defendants' argument in *Collum* and *Balark* that we should abstain from proceeding with these

---

**5.** In *Balark*, the Stipulation contained the following clause at paragraph 5:

5. That plaintiffs BERTHA BALARK, DANA BALARK, ANNE BALARK and DANE BALARK have discussed this matter of settlement thoroughly with their attorneys, and are aware of the method of payment of this judgment against the defendants, and they are satisfied with the amount of FOUR THOUSAND TWO HUNDRED FIFTY AND NO/100 ($4,250.00) DOLLARS for each of the four plaintiffs, and the method of payment as total settlement of all claims arising out of this incident between the plaintiffs herein and the defendants herein.

Exhibit A, *Balark* Complaint, Stipulation ¶ 5. Our analysis of paragraph 9 in *Collum* applies with equal force to paragraph 5.

cases due to pending state court litigation, we incorporate by reference here our opinion in the *Evans* case dated July 9, 1979, in which we held that abstention is inappropriate.

The City has, without citing any authority, argued that Comptroller Burrus is not a proper party defendant. We will deny the motion to dismiss as to Burrus.

*Due Process and Equal Protection Issues*

We should note at the outset that the questions concerning the constitutionality of § 9–104 and the City's payment practices are before us on a motion to dismiss for failure to state a claim upon which relief can be granted, Fed.R.Civ.P. 12(b)(6). We do not, therefore, at this stage in the proceedings, rule upon the constitutionality of § 9–104 and the payment practices but consider only whether plaintiff has stated a claim. *See e. g., Kalodimos v. City of Chicago*, 78 C 5012, Memorandum Opinion, Grady, J. (July 11, 1979) (denying motion to dismiss § 1983 action challenging constitutionality under due process clause of City's policy and practice of withholding towed cars until towing costs paid).

*Due Process*

■ The procedural aspect of due process requires a two-step analysis: (1) whether due process applies—that is, whether plaintiffs have been deprived of a protectable property interest; and (2) what process is due. *Board of Regents v. Roth*, 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972). We will address these questions in turn.

■ To have a property interest protectable by due process, a person must have "a legitimate claim of entitlement to it." *Roth, supra*, at 577, 92 S.Ct. at 2709. Property interests "are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law—rules or understandings that secure certain benefits and that support claims of entitlement to those benefits." *Id.* at 577, 92 S.Ct. at 2709; *Bishop v. Wood*, 426 U.S. 341, 344, n.7, 96 S.Ct. 2074, 2077, n.7, 48 L.Ed.2d 684 (1976).

■ Rights acquired by a judgment are property rights which cannot be taken without due process of law. *Louisiana ex rel. Folsom v. Mayor and Administrators of New Orleans*, 109 U.S. 285, 3 S.Ct. 211, 27 L.Ed. 936 (1883); *Collins v. Welsh*, 75 F.2d 894 (9th Cir. 1935); *Arnold & Murdock Co. v. Industrial Commission*, 314 Ill. 251, 145 N.E. 342 (1924); *Martinez v. Fox Valley Bus Lines*, 17 F.Supp. 576, 577 (N.D.Ill.1936) (applying Illinois law); *Gilman v. Tucker*, 128 N.Y. 190, 28 N.E. 1040 (1891); *Livingston v. Livingston*, 173 N.Y. 377, 66 N.E. 123 (1903); 16A Am.Jur.2d § 598 at 535. Indeed, it has been stated in Illinois that "A city and its officers can have no higher duty than the payment of an honest debt reduced to judgment against the City...." *People ex rel. Farwell v. Kelly*, 367 Ill. 616, 12 N.E.2d 612 (1938); 26 Ill.L.P., Mandamus, § 82 at 71.

Having established that plaintiffs have a property interest in the payment of their judgments against the City, the question becomes whether the City's delay in paying the judgments constitutes a taking or a deprivation within the meaning of the Fourteenth Amendment. "[A]s long as a property deprivation is not *de minimis*, its gravity is irrelevant to the question whether account must be taken of the Due Process Clause." *Goss v. Lopez*, 419 U.S. 565, 576, 95 S.Ct. 729, 737, 42 L.Ed.2d 725 (1975). "Any significant taking of property by the State is within the purview of the Due Process Clause." *Fuentes v. Shevin*, 407 U.S. 67, 86, 92 S.Ct. 1983, 1997, 32 L.Ed.2d 556 (1972); *North Georgia Finishing, Inc. v. Di-Chem*, 419 U.S. 601, 606, 95 S.Ct. 719, 722, 42 L.Ed.2d 751 (1975). "Although the length or severity of a deprivation of use or possession would be another factor to weigh in determining the appropriate form of hearing, it [is] not deemed to be determinative of the right to a hearing of some sort." *Id.* A temporary, nonfinal deprivation of property is nonetheless a "deprivation" in terms of the Fourteenth Amendment." *Fuentes v. Shevin, supra*, 407 U.S. at 84–85, 92 S.Ct. at 1996–1997.

■ In ordinary, quotidian business transactions, there are, of course, unavoidable delays which take place in the payment of money. The processing of checks, for example, takes time. Although the creditor does not have the present use of his money in the interim, the conclusion for due process purposes might be that such an unavoidable, temporary deprivation is *de minimis* *(Goss v. Lopez, supra)*—certainly not significant enough for a hearing to be required. The same cannot be said about delays in payment of judgments for two, four or even ten years. While there is a degree of arbitrariness in determining just when the taking occurs, we are aware that "[t]he Fourteenth Amendment draws no bright lines around three-day, 10-day, or 50-day deprivations of property." *Fuentes, supra*, at 86, 92 S.Ct. at 1997. We believe that in a case such as this involving the payment of tort judgments by a municipality, a taking occurs from the date of judgment until satisfied.[6] This determination is separate from the issue of what process is due—when a hearing is required—which we discuss below.

■ While we have clarified the source of the property interest here, finding that it arises from the judgment itself rather than the statute, we reaffirm our earlier opinion in *Evans* holding that the original judgment holders have a protectable property interest which has been taken by the City. We now reach the same conclusion with respect to the assignors in *Collum* and the original judgment holders in *Balark*.

*What Process is Due*

"[D]ue process is flexible and calls for such procedural protections as the particular situation demands." *Morrissey v. Brewster*, 408 U.S. 471, 481, 92 S.Ct. 2593, 2600, 33 L.Ed.2d 484 (1972). Accordingly, resolution of the issue of whether the procedures provided by § 9–104 are constitutionally sufficient requires analysis of the governmental and private interests that are affected. *Goldberg v. Kelly*, 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970). In *Matthews v. Eldridge*, 424 U.S. 319, 335, 96 S.Ct. 893, 903, 47 L.Ed.2d 18 (1976), the Supreme Court said that "identification of the specific dictates of due process generally requires consideration of three distinct factors:"

First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

" 'An elementary and fundamental requirement of due process in any proceeding which is to be accorded finality is notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the actions and afford them an opportunity to present their objections.' " *Memphis Light, Gas & Water v. Craft*, 436 U.S. 1, 13, 98 S.Ct. 1554, 1562, 56 L.Ed.2d 30 (1978), quoting, *Mullane v. Central Hanover Trust Co.*, 339 U.S. 306, 314, 70 S.Ct. 652, 657, 94 L.Ed. 865 (1950). "The purpose of notice under the Due Process Clause is to apprise the affected individual of, and permit adequate preparation for, an impending 'hearing.' " *Id.* 436 U.S. at 14, 98 S.Ct. at 1563. The Supreme Court has consistently held that some form of hearing is required before an individual is deprived of a proper-

---

**6.** We find support for our conclusion that a taking occurs from the date of judgment in the Illinois statute dealing with payment of interest on judgments, which provides that interest shall run "from the date of the judgment until satisfied." See Ill.Rev.Stats. ch. 74, § 3. "Interest is awarded because the party who has retained the money has had its use and benefit while the party who has been entitled to the money has been deprived of the opportunity to use it." *Harland v. State of California*, 99 Cal. App.3d 839, 160 Cal.Rptr. 613, 618 (App.1979). In other words, the payment of interest signifies that a not insignificant deprivation exists. That is not to imply that plaintiffs here suffer no injury because they may eventually receive some interest payment for the use of their money during the delay.

ty interest. *Matthews v. Eldridge, supra,* 424 U.S. at 333,[7] 96 S.Ct. at 902.

Turning now to an examination of § 9–104 in light of the foregoing standards, it is clear that the key private interest affected by official action—or inaction—under the statute is the present use and enjoyment of money owing on the judgment. The private interest in present use is intensified by the fact that this is money owed as compensation for some injury previously suffered. There is also a private interest in knowing, with some reasonable degree of certainty, when one will receive payment. Even if some delay in payment is justifiable, such delay should be accompanied by a procedure which informs the creditor when he will be paid and gives him an opportunity to object to the delay. Otherwise, the creditor is left in a state of limbo, unable to plan and arrange his future plans in reliance upon payment. The City's interest is that of fiscal management, which involves limiting the amount of debt it undertakes each year.

The risk of wrongful injury to these private interests through the procedures used by the City under § 9–104 is substantial. Section 9–104 gives the "governing body" complete discretion in deciding when it will pay judgments. The statute does not require the City to pay a judgment in full in the fiscal year it becomes final. No notice or hearing is required in connection with the decision to not pay in full in the first fiscal year. The City can pay the judgment during the ensuing fiscal year if, "in the opinion of its governing body, the unpaid amount of the tort judgment is not too great to be paid out of revenues for the ensuing fiscal year, ...." § 9–104. Again, no notice or hearing is required for the decision to pay during the ensuing year. We cannot reasonably interpret the phrase "in the opinion of its governing body" to mean that a hearing is required.

If the City does not pay in the first fiscal year, and "its governing body is of the opinion" that undue hardship will arise if it pays the entire judgment in the ensuing year, then "the governing body shall pay the judgment or settlement, with interest thereon, in not more than 10 [equal] annual installments. (the "10 year installment plan"). No notice or hearing is required in connection with the decision to employ the 10 year installment plan.

In sum, there are three interrelated decisions the City can make regarding when it will pay, with no notice or hearing provided for the creditor: (1) whether to pay in the first year; (2) whether to pay in the ensuing year; (3) whether to pay via installment over ten years.

Nor is it at all clear from the statute when the decisions whether to pay in the ensuing fiscal year or by installments must be made. On the one hand, one might read § 9–104 as requiring the City to decide whether to pay during the ensuing year or via installment before the end of the first fiscal year when it decides it cannot pay in the first year. On the other hand, one might read § 9–104 as allowing the City to decide that at some point in the ensuing year that it cannot pay in the ensuing year and must pay via installments.

The statute contains no procedures to protect against the City's abuse of its own discretion: no open hearing, no opportunity for representation by counsel, no appeals procedures or judicial review. The risk of wrongful deprivation is increased by the fact that the debtor itself is deciding when it will pay. Leaving the determination of whether delay is justified solely to the par-

---

7. A recent decision by the Third Circuit, *Rogin v. Bensalem Township*, 616 F.2d 680 (3d Cir. 1980), provides a useful summary of due process safeguards:

> The Court has identified the following as elements of due process: (1) notice of the basis of the governmental action; (2) a neutral arbiter; (3) an opportunity to make an oral presentation; (4) a means of presenting evidence; (5) an opportunity to cross-examine witnesses or to respond to written evidence; (6) the right to be represented by counsel; and (7) a decision based on the record with a statement of reasons for the result. Whether all or any one of these safeguards are required in a particular situation depends on the outcome of the balancing test mentioned above. [Footnotes omitted]
> *Id.* at 694.

ty most interested in delay is surely a suspect procedure.

In considering the probable value of additional or substitute procedural safeguards, we have reviewed the statutes of other states dealing with the payment of judgments against municipal corporations. We did not find any judgment payment scheme like the discretionary 10 year installment plan in Illinois, except a California statute whose history highlights the constitutional problems with the present Illinois statute.

Prior to 1975, California had a judgment payment statute which was substantially identical to § 9–104. Cal.Stats., Government Code, § 970.6. In 1975, the California statute was amended upon the recommendation of the California Law Revision Commission. *See* Recommendations relating to payment of judgments against local public entities, 12 Cal.L.Revision Comm. Reports 575 (1974). Although there had not been an evident misuse of the provision, § 970.6 was amended "to insure against misuse by local public entities of the installment plan of paying the judgments." 7 Pacific Law Journal 533, 534 (1975). The amended California statute, § 970.6, provides:

§ 970.6 Payment of judgments with interest during ensuing fiscal year; installment payments.

(a) *Subject to subdivision (b)*, if a local public entity does not pay a . . . judgment *with interest thereon*, during the fiscal year in which it becomes final . . . the governing body shall pay the judgment, *with interest thereon*, during the ensuing fiscal year immediately upon the obtaining of sufficient funds for that purpose.

(b) . . . *The court which enters judgment shall order* that the governing body pay the judgment, with interest thereon, in not exceeding 10 annual installments *if both of the following conditions are satisfied*:

(1) *The governing body of the local public entity has adopted an ordinance or resolution finding that an unreasonable hardship will result unless the judgment is paid in installments.*

(2) *The court, after hearing, has found that payment of the judgment in installments as ordered by the court is necessary to avoid an unreasonable hardship.*

(c) Each *installment* payment shall be of an equal portion of the principal of the judgment. The local public entity, in its discretion, may prepay any one or more installments or any part of an installment.

(d) The authority to pay a . . . judgment in installments as provided in this section is an addition to and not in lieu of any other law permitting local public entities to pay . . . judgments in installments. (Amended by Stats.1975, c. 285, p. 705, § 5.)

[Italics in original; indicates amended portions.]

Although the principle of separation of powers precludes us from offering the amended California statute as a paradigm for Illinois, the amendments highlight the risk of wrongful deprivation under the prior discretionary scheme and provide substitute procedural safeguards. First, under § 970.-6(a), the City must pay the judgment with interest during the first or the ensuing fiscal year. The phrase " . . . and if, in the opinion of the governing body, the unpaid amount of the tort judgment is not too great to be paid out of revenues for the ensuing fiscal year, . . ." was deleted from subsection (a), thus removing the discretionary choice not to pay in the ensuing year. Also, subsection (a) provides (as did the prior statute) that the judgment shall be paid during the ensuing fiscal year "immediately upon the obtaining of sufficient funds for that purpose." The Illinois version of subsection (a) omitted this clause and just requires payment "during the ensuing fiscal year." Thus, the Illinois version of (a) allows the City to pay later in the ensuing fiscal year than does the California statute, which requires payment immediately upon obtaining the funds.

Turning now to subsection (b) of the California statute, we note that the City cannot delay payment beyond the ensuing year— cannot use the 10 year installment plan— unless two conditions are satisfied: (1) the

governing body must adopt an ordinance or resolution finding an unreasonable hardship unless the judgment is paid in installments; and (2) the court which enters the judgment must hold a hearing and thereafter rule that the installment plan is necessary to avoid unreasonable hardship.

The procedures of § 970.6 go a long way toward reducing the risks of wrongful deprivation. The scheme protects the private interests through a judicial hearing and review. It also accommodates the Government's interest in fiscal management by permitting installment payments in cases of unreasonable hardship. In short, the balance of governmental and private interests—a balance we must consider in deciding what process is due, *Matthews v. Eldridge, supra,* 424 U.S. at 335, 96 S.Ct. at 903 is more satisfactorily struck in the California statute than in the Illinois statute, which accommodates only the City's interest.

In striking the appropriate due process balance, we must finally assess the fiscal and administrative burden that would be associated with the notice and hearing. While we have held that a deprivation occurs so long as the City delays payment

beyond the time the judgment is rendered and a property interest vests, the City's interest in fiscal management would be ill-served by a requirement of notice and hearing immediately after judgment. Obviously, the administrative burden and waste involved would outweigh any benefits. It is difficult to decide at what point along the time line of delay notice and hearing is required. It helps to keep in mind that due process if flexible and must be tailored to the demands of particular situations. *Goldberg v. Kelly,* 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287. We will address this issue further when we discuss certification of a class in *Balark.*

 At this point, we have gone far enough in delineating the applicable due process standards to decide that plaintiffs have stated a claim upon which relief can be granted. We cannot rewrite § 9–104 on this motion to dismiss. That may eventually be a job for the Illinois legislature if, based upon some future ruling, amendment becomes necessary.[8]

### Equal Protection

In the *Collum* and *Balark* cases, plaintiffs have alleged that they have been denied

---

**8.** An issue which was not raised by the parties but which has troubled us is whether, even if the procedural safeguards of notice and hearing are added to § 9–104, the statute violates substantive due process by allowing the City to pay judgments against it in equal installments over ten years. Protection from arbitrary action is the essence of substantive due process. *Ohio Bell Telephone Co. v. Public Utilities Commission of Ohio,* 301 U.S. 292, 57 S.Ct. 724, 81 L.Ed. 1093 (1937); *Slochower v. Board of Education,* 350 U.S. 551, 76 S.Ct. 637, 100 L.Ed. 692 (1956); 16A Am.Jur. § 816 (and cases cited therein). Where, as here, a fundamental right is not involved, the test for a violation of substantive due process is one of reasonableness and is similar to the rational basis test used in equal protection analysis. *United States v. Carolene Products Co.,* 304 U.S. 144, 58 S.Ct. 778, 82 L.Ed. 1234 (1938); Nowak, Rotunda, Young *Constitutional Law,* at 398, 408. That is, the statute need only rationally relate to some legitimate end of government.

We might express concern, without deciding, that the 10 year installment plan of § 9–104 does not meet these substantive due process requirements. Is the payment of judgments over a 10 year period a means rationally related

to the legitimate governmental end of sound fiscal management? Where, as in Illinois, a City can annually levy taxes sufficient to pay outstanding judgments and settlements against it (see Ill.Rev.Stat. ch. 85, § 9–107), it may be argued that there is no rational basis for delaying judgment creditors over a 10 year period. Arguably, the 10 year installment plan is an arbitrary postponement of obligations, a period which is so long that it can destroy the property right itself, if we define that right as the right to present use and enjoyment of the money.

Ultimately, we run up against the fundamental principle that the judiciary may not encroach upon legislative functions. *Schnell v. Peter Eckrich & Sons, Inc.,* 365 U.S. 260, 81 S.Ct. 557, 5 L.Ed.2d 546 (1961). We have found no cases directly on point—cases that could guide a court in placing a due process limit, in terms of months or years, on the time a municipality can take to pay judgments against it.

If eventually § 9–104 is amended to provide procedural due process safeguards for a decision to pay via installment, it may be that any use of the installment payment method will be minimized.

equal protection because the City pays tort claims later than contract claims. Collum Complaint at Count II; Balark Complaint at Count III. In their response to the City's motion to dismiss in *Balark*, plaintiffs make two additional equal protection arguments: (1) that the City does not pay judgments in order of entry, thus paying older judgments later than newer; and (2) that the City pays tort judgment creditors with judgments for less than $1,000.00 earlier than tort judgment creditors with judgments over $1,000.00.[9]

Where no "suspect classification" or "fundamental right" is involved, the test for determining whether equal protection of the law has been denied is whether the classification drawn by the statute bears some rational relationship to a legitimate state purpose. *Ropico v. City of New York*, 425 F.Supp. 970, 977 (S.D.N.Y.1976) (holding that "... in a matter involving fiscal policy, the state need only show that it [the legislative classification] bears some rational relationship to a legitimate state purpose."); *San Antonio Independent School District v. Rodriquez*, 411 U.S. 1, 93 S.Ct. 1278, 36 L.Ed.2d 16 (1972); *Wojcik v. Levitt*, 513 F.2d 725 (7th Cir. 1975). Although some of the plaintiffs before us are black, the statutory scheme does not establish a classification based upon race; thus, no "suspect classification" is involved here.

Nor is the right to immediate payment of a judgment a "fundamental right," such as the right to terminate pregnancy (*Roe v. Wade*, 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973)); the right to vote (*Bullock v. Carter*, 405 U.S. 134, 92 S.Ct. 849, 31 L.Ed.2d 92 (1972)); the right to travel (*Shapiro v. Thompson*, 394 U.S. 618, 89 S.Ct. 1322, 22 L.Ed.2d 600 (1972)); First Amendment rights (*Williams v. Rhodes*, 393 U.S. 23, 89 S.Ct. 5, 21 L.Ed.2d 24 (1968)); or the right to procreate (*Skinner v. Oklahoma ex rel. Williamson*, 316 U.S. 535, 62 S.Ct. 1110, 86 L.Ed. 1655 (1942)). The two cases which plaintiffs in *Balark* rely upon for the proposition that right to immediate payment is a fundamental right simply do not so hold. *See Meyer v. Nebraska*, 262 U.S. 390, 43 S.Ct. 625, 67 L.Ed. 1042 (1923); *United States Trust Company of New York, et al. v. New Jersey, et al.*, 431 U.S. 1, 97 S.Ct. 1505, 52 L.Ed.2d 92 (1977).

We turn first to the question of whether the practice of paying judgments of less than $1,000.00 earlier than those in excess of $1,000.00 is an equal protection violation. As far as we can determine from the record presently before us, this practice is a custom and policy of the City and does not derive from a statutory source, although we are aware of at least one Illinois statute which incorporates the $1,000.00 distinction in payment of judgments.[10] The

9. The equal protection issue regarding priority to judgments of $1,000.00 or less does not explicitly appear in the *Balark* or *Collum* complaints, but rather is argued in briefs on the motion to dismiss. For the sake of expediting this already protracted litigation, we will treat this issue in conjunction with the non-tort priority question and grant plaintiffs leave to amend the *Balark* and *Collum* complaints pursuant to Fed.R.Civ.P. 15(a).

10. It appears that ch. 24, § 8–1–16, Ill.Rev. Stat., incorporates the policy that judgments of $1,000.00 or less are to be paid earlier than judgments greater than $1,000.00. Section 8–1–16 provides that the City may levy a tax annually, for the purpose of paying judgments against it, at a rate that will produce a sum not to exceed $4,500,000.00. The statute further provides:

All money received from this tax shall be set apart in a separate fund and shall be used solely for the purpose of payment judgments as provided for in this section. Judgments against the municipality shall be paid out of this fund in the order in which the judgments were obtained. This order of payment shall not apply to judgments of $1000 or less, which judgments may be paid out of said order and in the order in which these judgments of $1000 or less were obtained.

Presumably, the exception as to order of payment for judgments of $1,000.00 or less relates to the policy of paying those judgments earlier. Section 8–1–16 is not, apparently, the origin of the $1,000.00 or less priority scheme; rather, that scheme is a practice, policy or custom of the City.

The complaints in *Collum* and *Balark* do not challenge the constitutionality of § 8–1–16. The statute came to our attention because in *Evans*, the City has argued by way of explanation for the delays, that the 4.5 million dollar figure in § 8–1–16 places a limitation on the amount the City can expend annually in satis-

City has admitted that "Tort judgments for $1,000.00 and under are paid upon presentation to the Department of Finance [and] [t]ort judgments over $1,000.00 are paid in chronological order on the date of entry from the judgment." Answer to Request for Admissions at ¶ 5(a). The City pays judgments of less than $1,000.00 within 30 days (Defendant's Reply, *Balark* at 3) whereas those in excess of $1,000.00 are delayed for up to 4½ years. *Balark* Complaint at ¶ 10.

The City offers the following defense: It is the City's attempt to satisfy the small judgments at the earliest possible time and defendants find it preposterous that plaintiffs should charge defendants with a violation of equal protection by not delaying the payment to the smaller judgment creditors. Of course, the City of Chicago would like to pay all tort judgments within thirty days but due to the fact that these judgments now total over 14 million dollars, this is impossible. Reply at 4.

■ The foregoing argument, we believe, misses the point. Equal protection does not require that all tort judgments be paid within 30 days, but rather requires that the City's policy of paying smaller judgments earlier bear some rational relationship to a legitimate state purpose. *San Antonio School District, supra; Ropico v. New York, supra.* The City clearly has a legitimate interest in sound fiscal management, an element of which is the limitation of the amount of debt it undertakes to satisfy each year. We are not persuaded at this point, however, that giving priority to the payment of smaller judgments is a policy rationally related to that legitimate end.

Regardless of the size of the judgment, the obligation to pay remains constant. In this respect, judgment creditors with claims in excess of $1,000.00 are similarly situated for equal protection purposes with judgment creditors holding claims of less than $1,000.00. The effect of giving priority to judgments under $1,000.00 is to decrease the fund from which larger judgments can be paid and to increase delay on those judgments. We do not believe that a policy of full satisfaction of smaller judgments within 30 days serves the purpose of staying within a budgetary limitation on debt payment to any greater degree than does payment of all judgments according to the same scheme.

The case of *Flushing National Bank v. Mutual Assistance Corp.*, 40 N.Y.2d 731, 390 N.Y.S.2d 22, 26, 358 N.E.2d 848, 852 (Ct. App.1976) is of some assistance here. In that case, the court held void under of the state constitution the New York Emergency Moratorium Act which provided that unless temporary short-term note holders exchanged their notes for long-term bonds, they could not bring actions to enforce their debts. The court said:

> It is argued that the city has insufficient funds to pay the notes and cannot in good faith use its revenue powers to pay notes. The city has an enormous debt and one that in its entirety, if honored as portions came due, undoubtedly exceeds the city's present capacity to maintain an effective cash flow. *But it is not true that any particular indebtedness of the city,* let alone the outstanding temporary notes, *is responsible for any allocable insufficiency. In short, what has happened is those responsible have made an expedient selection of the temporary noteholders to bear an extraordinary burden.*

(Emphasis added). While the infirmity in *Flushing* was analyzed under the New York Constitution rather than the equal protection clause, we believe plaintiffs may be able to show that the City of Chicago has made a similar "expedient selection" of judgment holders with claims over $1,000.00 to bear an extraordinary burden—here, by way of delay—of the City's indebtedness.

faction of outstanding judgments. That interpretation of § 8–1–16 is contrary to the clear language of the statute itself which states that "the judgment tax ... shall be in addition to the maximum of all other taxes which the mu-

nicipality is now, or may be hereafter, authorized by law to levy...."

Plaintiffs may amend their complaints to challenge § 8–1–16 on equal protection grounds if they so desire. Fed.R.Civ.P. 15(a).

We turn now to the claim that the payment of contract or non-tort judgments prior to tort judgments violates equal protection. We note at the outset that plaintiffs challenge the "practice" of paying non-tort judgments earlier than tort judgments. *See Collum* complaint ¶ 28; *Balark* complaint ¶ 21. As with the $1,000.00 or less priority scheme, the priority given to non-tort judgments is not statutorily based. Further discovery is necessary to clarify the source and reasons for the City's policy or practice. It is clear though that plaintiff may be able to show that giving priority to non-tort judgments violates equal protection for the same reasons we have discussed regarding the priority given to judgments of $1,000.00 or less. The City's obligation to pay remains constant regardless of the size and type of judgment. We can think of no rational basis for not paying all judgments in the order they are entered, or according to some logical sequence, regardless of type.[11]

Finally, with regard to the claim that the payment of tort judgments out of order is a denial of equal protection, we believe that the record is not sufficiently informative about the incidence of out-of-order payment or the circumstances surrounding such payment to enable us to say that the practice rises to the level of discrimination or arbitrariness for Fourteenth Amendment purposes. Further discovery is required.[12]

*Class Certification of Assignors in Collum*

In our January 2, 1980, order in the *Evans* case, we certified a class of original judgment holders, specifically excluding assignees or purchasers of judgments and assignors—those who assigned, factored or "discounted" their judgments prior to full or partial payment by the City.[13] On January 14, 1980, we denied an oral motion to reconsider the class definition to include assignees. Our reason for excluding assignees, which we reaffirm here, is that, in all

11. In so holding, we are aware of our prior decision in *Evans* on December 12, 1978, where we reached a different conclusion on the question of whether the payment priority for non-tort judgments violates equal protection. We have reconsidered our analysis on that question and no longer find it convincing.

Also, we realize that § 9–104 refers to the payment of tort, not contract, judgments and settlements. If it is finally determined that all judgments, regardless of type, must be paid according to the same schedule, legislative amendment of § 9–104 to include contract judgments might be necessary.

12. We should dispel some confusion that may exist with respect to a memorandum opinion we issued on September 27, 1979, addressing defendant's motion to dismiss in *Balark*. In that opinion we said:

We are persuaded by defendants' arguments that plaintiffs have not stated a cause of action upon which relief can be granted since defendants have not yet failed to comply with the statute. From the memoranda submitted by the parties, however, we are unable to tell whether the fiscal year in which plaintiffs' judgments were entered has yet ended. If the fiscal year has not yet ended, we will grant defendants' motion to dismiss for failure to state a claim.

We directed defendants via minute order (October 1, 1979) to furnish an affidavit stating whether the fiscal year including April 10, 1979, had yet ended. Defendants responded with an affidavit stating that the fiscal year of

the City of Chicago is from January 1 to December 31. Green Affidavit, October 5, 1979.

The logic of our September 27 order, when read in conjunction with the submitted affidavit, would indicate dismissal. However, we never, in fact, ordered the *Balark* complaint dismissed. In any event, the issue of ripeness which concerned us then does not, in light of our due process and equal protection analysis, concern us now.

13. We certified the following class in Evans:

All persons in whose favor a final tort judgment[1] in excess of $1,000.00 against the City of Chicago has been or will have been entered commencing with the fiscal year 1972[2] and continuing to the date of the entry of final judgment in this case and payment of whose judgment is overdue by reason of the failure of the City of Chicago (a) to pay the judgment in full in the fiscal year it was entered or in full during the ensuing fiscal year in accordance with Ill.Rev.Stat. ch. 85, § 9–104(a) or (b) to commence timely payment of installments on the judgment pursuant to Ill.Rev.Stat. ch. 85, § 9–104(b) no later than the end of the first fiscal year following entry of judgment.[3] The class shall not include assignees or purchasers of judgments nor those persons who assigned, factored or "discounted" their judgments prior to full or partial payment by the City of Chicago.[4]
[footnotes omitted]

likelihood, the assignees knew at the time they purchased the judgments that they would not be promptly paid.

Plaintiffs in *Evans* and *Collum* also moved to reconsider the class definition to include assignors. We will not alter the class as certified in the January 2 order, but for the following reasons will certify a separate class of assignors with plaintiff Collum as the assignor class representative.

*Requirements of Rule 23*

Plaintiff has the burden of showing that the requirements of Rule 23 have been met. *Cook County College Teachers, Local 1600 v. Byrd*, 456 F.2d 882, 885 (7th Cir.), *cert. denied*, 409 U.S. 848, 93 S.Ct. 56, 34 L.Ed.2d 90 (1972). Plaintiff must first show that the four prerequisites of Rule 23(a) have been met, and then show that the class he purports to represent falls within one of the three subcategories of Rule 23(b). Under Fed.R.Civ.P. 23(a), plaintiff may sue on behalf of all members of a class only if

(1) the class is so numerous that joinder of all members is impracticable;

(2) there are questions of law or fact common to the class;

(3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and

(4) the representative will fairly and adequately protect the interests of the class.

Under 23(b), a class action is maintainable if the four prerequisites of (a) are satisfied, and in addition:

(1) the prosecution of separate actions by or against individual members of the class would create a risk of

(A) inconsistent or varying adjudications with respect to individual members of the class which would establish incompatible standards of conduct for the party opposing the class, or

\*　　\*　　\*　　\*　　\*　　\*

(2) the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole; or

(3) the court finds that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy.

*Assignors as a Valid Class.* Plaintiff in *Collum* seeks class certification under 23(b)(1) or (3). (Collum Complaint at 8; Collum's Comments Concerning Assignors as a Valid Class at 3.) Defendants have not raised objections to certification on grounds that the requirements of numerosity, typicality and adequacy are not satisfied. Rather, defendants argue that the commonality requirements of 23(a)(2) and (b)(3) are not met here. We will consider the 23(a) requirements in turn.

*Numerosity.* Plaintiff has estimated that the class of assignors he seeks to represent has several thousand members. Clearly, the class is sufficiently large that joinder would be impracticable, as defendants concede.

*Commonality.* If there were no common questions of law or fact, those questions obviously could not predominate over questions affecting individual members, as Rule 23(b)(3) requires. We will therefore treat the commonality requirement of Rule 23(a)(2) in connection with the predominance requirement of Rule 23(b)(3), which subsumes it. 7 C. Wright & A. Miller, *Federal Practice and Procedure* § 1763, at 610 & n.7 (1972); *Sullivan v. Chase Investment Services of Boston*, 79 F.R.D. 246, 257 (N.D.Cal.1978).

*Typicality.* To satisfy the typicality requirement, plaintiff "must be part of the class and 'possess the same interest and suffer the same injury' as the class members." *East Texas Motor Freight v. Rodriguez*, 431 U.S. 395, 403, 97 S.Ct. 1891, 1896, 52 L.Ed.2d 453 (1977). Plaintiff Collum alleges that he is one of a class of assignors who assigned their tort judgments, at a discount, in reliance upon the defendants' policy and practice of delaying payment.

We believe plaintiff has satisfied the typicality requirements.

■ *Adequacy of Representation.* To be an adequate representative of the plaintiff class, plaintiff must have an attorney who is qualified to conduct the proposed litigation, and plaintiff must not have interests antagonistic to those of the class. *Wetzel v. Liberty Mutual Ins. Co.*, 508 F.2d 239, 247 (3d Cir. 1975), *cert. denied*, 421 U.S. 1011, 95 S.Ct. 2415, 44 L.Ed.2d 679. Defendant does not challenge the qualifications of plaintiff's attorney, and we believe that he is competent to proceed with this litigation. Nor are we aware of any conflict of interest between plaintiff and the class.

### The 23(b) Requirements

In its prayer for relief, plaintiff in *Collum* seeks: (1) a declaratory judgment that the denial of payment violates due process and equal protection; (2) an injunction to compel payment; (3) a declaratory judgment that § 9–104 is unconstitutional; and (4) compensatory damages.

■ *23(b)(1)(A).* Under 23(b)(1)(A) the question is whether individual actions would have an adverse effect on the party opposing the class. 7A Wright & Miller § 1773. Once the court determines that there is a risk of separate individual actions, it must consider whether allowing the members to proceed on their own will expose the defendants to a serious risk of being put into a "conflicted position." *Id.* at 796. We believe that such a risk does not exist here. There is really only one issue determinative of the defendants' liability to the assignors: the constitutionality of § 9–104 and the City's payment practices or policies. Once that issue is decided, principles of res judicata and collateral estoppel would avoid the risk that incompatible standards of conduct would be established for the City.

*23(b)(2).* Although plaintiff in *Collum* has not sought certification under (b)(2), we will discuss (b)(2) in order to clarify the relief sought in *Collum* and to distinguish the *Collum* class from one we will certify in

*Balark.* Subsection (b)(2) was not intended to "extend to cases in which the appropriate final relief relates exclusively or predominantly to money damages." 1966 Advisory Committee Note to Rule 23. 28 U.S.C.A. Rule 23 at 298. Rather, the Rule by its terms speaks to cases where, on behalf of the class as a whole, "final injunctive relief or *corresponding* declaratory relief" is appropriate. According to the Committee, "declaratory relief 'corresponds' to injunctive relief when as a practical matter it affords injunctive relief or serves as a basis for later injunctive relief." *Id.* at 298; *Sarafin v. Sears, Roebuck and Co., Inc.*, 446 F.Supp. 611, 615 (N.D.Ill.1978). That is, the declaratory judgment should perform the same function as an injunction. "It should not lay the basis for a later damage award." *Id.; See* 7A Wright & Miller, *Federal Practice & Procedure*, § 1775 at 22 (1972).

Although plaintiff in *Collum* has requested declaratory and injunctive (as well as compensatory) relief, the appropriate final relief for assignors relates predominantly to money damages. The assignors seek primarily to be made whole—to be put in the position they would have been in had they not sold their judgments. The appropriate relief is the amount of the discount plus any interest owing thereon. Since the assignors sold their judgments and are no longer subject to the statutory scheme, any request for injunctive relief or "*corresponding*" declaratory relief going to the constitutionality of the statute (on its face or as applied) would be moot. With respect to the assignors, the effect of a declaratory judgment that § 9–104 is unconstitutional would be to "lay the basis for a later damage award." *Sarafin, supra*, at 615. Thus, 23(b)(2) cannot serve as a basis for certification in *Collum.*

*23(b)(3).* Rule 23(b)(3) applies where common questions of law or fact predominate over individual questions, and where the class action is the superior method of adjudication. Defendants argue that plaintiff cannot meet the commonality requirement because each assignor would have to present individual proof that he sold his

judgment because of the City's unconstitutional policy. Defendants request that we adopt the holding of the Illinois Appellate Court in *Nebel v. City of Chicago*, 53 Ill. App.3d 890, 11 Ill.Dec. 620, 369 N.E.2d 74 (1st Dist. 1977)—a related case involving the same statute and alleged unlawful delays. There, the court declined to certify an assignor class.

While Count II of plaintiffs' complaint alleges that the named plaintiff and the class of persons she seeks to represent were forced to discount or factor their judgments as a result of the City's policy, a resolution of that factual issue in [one assignor's] favor is not conclusive as to anyone else. There may well have been other factors motivating such a course of action. Each plaintiff, therefore, would have to present individual proof of the circumstances under which he transferred his judgment so that it could be determined whether the factor motivating the transfer was the coercive effect of the City's alleged policy. It would thus be impractical to try this aspect of the case as a class action.

11 Ill.Dec. at 630, 369 N.E.2d at 84.

 We do not find these arguments persuasive. First, we must separate the question of liability from that of damages. The law is clear that differences in the amount of damages sought will not destroy the requisite commonality under 23(b)(3). *Hernandez v. United Fire Insurance Co.*, 79 F.R.D. 419, 425, 430 (N.D.Ill.1978). Clearly, there will be variations in the amount of damages each individual assignor will be entitled to. Determination of such damages will depend upon the amount of the original judgment and the discount percentage, and should involve a relatively uncomplicated accounting procedure in each case.

On the question of liability, we have held that the City may be liable to those who sold their judgments in reliance upon the policy and practice of delay. The issue then becomes whether we can infer such reliance on the part of the assignors, or whether, as defendants argue and *Nebel* decided, we must investigate the individual motivations of several thousand assignors to determine class membership. That latter task would be virtually impossible, and is, we believe, unnecessary.

Substantial evidence may exist from which to infer reliance upon the City's policy and practice. Plaintiff has stated that the evidence at or before trial will show that between 1965 (the year § 9–104(b) was enacted) and the present, the City always paid tort judgments over $1,000.00 more than one year and usually more than two years after date of entry and never paid in installments. We believe that proof of this long history of delayed payment and failure to use installment payment may be sufficient to raise the inference that assignors discounted their judgments in reliance upon an understanding that neither prompt nor partial payment would be forthcoming by the end of the ensuing fiscal year.

There is precedent for drawing an inference of reliance as we have suggested may be appropriate here. For example, in securities fraud cases where reliance upon misstatements or omissions is a key element of proof, a majority of courts and commentators have taken the view that issues of individual reliance and damages will not defeat a 23(b)(3) class action for lack of predominance of common questions. *See e. g. Seiden v. Nicholson*, 69 F.R.D. 681 (N.D. Ill.1976); *Hurwitz v. R. B. Jones Corp.*, 76 F.R.D. 149 (W.D.Mo.1977); *Green v. Wolf Corp.*, 406 F.2d 291, 301 (2d Cir. 1968); 3B Moore's Federal Practice, ¶ 23.45[2], pp. 23–762—23–764 (1980) ("On the whole, individual questions with respect to reliance have not defeated the class status of fraud cases...."); 7A Wright & Miller § 1781; Annotation, "Propriety, Under Rule 23 of Class Action for Violation of Federal Securities Laws," 9 ALR Fed. 118, 178. The underlying reason for the rule is expressed well in *Green v. Wolf Corp., supra*, where the court stated:

Wolf earnestly argues that each person injured must show that he personally relied on the misrepresentations in order to recover and thus any common issues of misrepresentations do not predominate

over the individual questions of reliance. Even if Wolf is correct in its assertion of the need for proof of reliance, and we express no views on that issue, we must still reject the argument. Carried to its logical end, it would negate any attempted class action under Rule 10b–5, since as the District Courts have recognized, reliance is an issue lurking in every 10b–5 action . . . . We see no sound reason why the trial court, if it determines individual reliance is an essential element of the proof, cannot order separate trials on that particular issue, as on the question of damages, if necessary. The effective administration of 23(b)(3) will often require the use of the "sensible device" of split trials. [cite omitted]

Wright and Miller indicate that separate trials may not be necessary where reliance can be inferred.

Although the typical means of handling the issue of reliance in class action securities cases is to separate the issue for a separate trial, the Supreme Court has held that a more objective standard of what constitutes reliance may be utilized and that actual reliance on the part of each defendant need not be shown. *Affiliated Ute Citizens of the State of Utah v. U.S.*, 406 U.S. 128 [92 S.Ct. 1456, 31 L.Ed.2d 741] (1972). Rather reliance may be inferred from the materiality of the misstatements or omissions. [cites] Under this approach no obstacle to class action treatment arises since reliance no longer presents an individual issue.

7A Wright & Miller § 1781 at 72–73.

It may be that reliance can be inferred from the materiality of the City's alleged long-standing policy and practice of delay, thereby avoiding the necessity of separate trials on the reliance questions. The policy argument favoring such an approach is similar to that in the securities fraud cases: a ruling that individual questions of reliance predominate would relegate assignors to individual proceedings, which, as we discuss below, would not be in the assignors' or the court's best interest.

Under 23(b)(3) we are also required to make a finding that a class action is the superior method of adjudication. We are to take into account the interest of the individual members in the prosecution of their own actions. First, we should note that under 23(c)(2), plaintiffs in a (b)(3) class action will receive notice and an opportunity to opt out if they wish to control their own litigation. Also, the damages relief would be the same in an individual as in the class action. A second consideration is the extent and nature of any litigation concerning the controversy already commenced. In the pending state court action (*Nebel, supra*) assignors have been excluded from class certification. Of the three federal cases, only Collum is an assignor, and neither Evans nor Balark can represent an assignor class. A third consideration is the desirability of concentrating the litigation in this forum. Most of the plaintiffs and all of the defendants as well as virtually all of the evidence are located in the Chicago area. Finally, we are to consider the difficulties likely to be encountered in managing the class action. The number of class members is large but they are easily identifiable. Proof of damages will largely involve mechanical application of an accounting formula and might be handled by a special master. We note in closing that without this class action, some assignors would be unaware of their own cause of action or unable, because of small means, to pursue it. Therefore, we find that the class action is the superior method for the fair and efficient adjudication of the controversy.

 We certify the following as a (b)(3) class in *Collum*. If it appears later that the class as defined is not in compliance with the rules, we will exercise our power under Rule 23(c)(1) to alter, amend, or decertify the class.

All persons in whose favor a final tort judgment or settlement in excess of $1,000.00 [14] against the City of Chicago

---

**14.** We have excluded those assignors who held judgments for less than $1,000.00 and discounted them, since it is uncontested that the City did not delay payment of judgments under $1,000.00.

has been entered and who, commencing with fiscal year 1974 [15] assigned their tort judgments, at a discount, prior to full or partial payment,[16] in reliance upon defendant's policy and practice of delaying payments of judgments.

*Class Certification in Balark*

*The 23(a) Requirements*

■ *Numerosity.* Plaintiff in *Balark* has estimated that the class he seeks to represent has "many hundreds or thousands" of members. In addition to the numerosity of the class, it is likely that some potential class members will be unaware of their own cause of action. The impracticability of joinder seems clear.

*Adequacy of Representation.* As in *Collum*, we believe plaintiff's attorney is competent to proceed with this litigation.

*Commonality.* As we noted earlier, the complaint in *Collum* challenges § 9–104 as violative of due process both on its face and as applied, whereas the *Balark* complaint does not challenge the facial validity of the statute. As is discussed in more detail below, however, we believe that a declaration that § 9–104 is unconstitutional would provide appropriate relief for the *Balark* class. For the sake of expediting this litigation, we will treat the constitutionality of § 9–104 as a question of law common to the *Balark* class and grant plaintiffs leave to amend their complaint pursuant to Fed.R. Civ.P. 15(a) to allege that § 9–104 is unconstitutional. This should be a simple matter, since it would only involve amending the *Balark* complaint to conform with the *Collum* complaint.

In addition to the facial constitutionality of § 9–104, the alleged practice, custom and policy of prioritizing non-tort and $1,000.00-

or-less judgments in violation of equal protection is a question common to the *Balark* class.

*Typicality and The 23(b)(2) Requirements.* Because of the interrelationship of issues, we will discuss the 23(a) typicality requirement and the 23(b)(2) requirements together.

Plaintiffs in *Balark* are original judgment holders distinguishable from the *Evans* plaintiffs only in that the *Balark* judgments were more recently obtained against the City. Plaintiff in *Evans* obtained her judgment on January 30, 1976; the *Balark* judgments were obtained April 10, 1979. As time runs on the *Balark* judgments, there will come a point where the Balarks will no longer be typical of the class—no longer " 'possess the same interest and suffer the same injury' as the class members." *East Texas Motor Freight v. Rodriguez, supra,* 431 U.S. at 403, 97 S.Ct. at 1896. This will occur because under the statute, and under conceivable amended versions of the statute, the opportunity for holding a hearing will pass and the appropriate relief will thereafter become predominantly money damages rather than a hearing.

■ We conceive the *Balark* class as one for which the due process safeguard of some kind of hearing is the appropriate relief, as well as injunctive relief against the practices and policies which allegedly violate equal protection. Thus, while the *Balark* complaint seeks certification under 23(b)(1) and (3), we believe 23(b)(2) is the proper subdivision under Fed.R.Civ.P. 23. Rule 23(b)(2) provides for maintenance of a class action where "the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief

**15.** This date is five years from the date *Collum* was filed, in conformity with our holding in the *Evans* certification that the five year statute of limitations of ch. 83 Ill.Rev.Stats. § 16 applies here.

**16.** We believe that the class should include those assignors who assigned their judgments

even as early as the day after they received them. The class should not be limited to those who held their judgments beyond the point where the City first delayed payment under the statutory scheme. Reliance upon the policy and practice of delay would not necessarily occur only at the end of the first or second year.

or corresponding declaratory relief with respect to the class as a whole; . . . ." Subdivision (b)(2) was added to Rule 23 in 1966 primarily to facilitate the bringing of class actions in the civil rights and constitutional rights areas. *See* 7A Wright & A. Miller, *Federal Practice & Procedure* § 1775 at 24–25 (1972). Where the suit is not predominantly seeking money damages, a request for a declaration that a statute is unconstitutional qualifies as "corresponding declaratory relief" for purposes of Rule 23(b)(2) because the resulting judicial directive would have the effect of enjoining the enforcement of the statute. *Id.* at 22. *See, e. g., Dixon v. Quern,* 76 F.R.D. 617 (N.D.Ill.1977) (certification of (b)(2) class appropriate in action seeking declaratory and injunctive relief against Illinois Department of Public Aid for terminating disability and medicaid payments without hearing); *Torres v. New York State Dept. of Labor,* 318 F.Supp. 1313 (S.D.N.Y.1970) (certification of (b)(2) class is civil rights action seeking declaratory judgment of unconstitutionality of New York Labor Law insofar as it allowed termination of unemployment compensation benefits without prior hearing); *Sullivan v. Houston Independent School District,* 307 F.Supp. 1328 (S.D.Tex.1969) (certification of (b)(2) class in suit challenging constitutionality of school district regulations).

Having determined that some kind of hearing is the appropriate relief for the *Balark* class, we turn to the question of when the hearing is due. For purposes of class definition, we must designate a point where the *Balark* plaintiffs would be entitled to become members of the *Evans* class. As we will discuss below, the predominant relief for the *Evans* class is money damages; payment has been delayed beyond the point where procedural due process would afford relief.

Under § 9–104, as we have said, the City has three decisions to make: (1) whether to pay in full the year of judgment; (2) whether to pay in full in the ensuing year; (3) whether to pay via installments. We have also indicated that the statute is simply not clear on when the second and third

decisions should be made—whether before the end of the first fiscal year, or before the end of the ensuing fiscal year. What is clear is that the decision to not pay in the ensuing fiscal year and to pay via installments must be made prior to the end of the ensuing fiscal year.

As a minimum due process requirement, we believe plaintiffs may be able to show that a hearing is due before the City pays via installment. When we certified the class in *Evans,* we construed § 9–104(b) as requiring the City to make the first of its annual installment payments no later than the fiscal year following the fiscal year the tort judgment became final. *See* January 2, 1980, order in *Evans* at n.3. Thus, at a minimum, a hearing would be required prior to the end of the ensuing fiscal year. For the purposes of defining the *Balark* class, then, we will limit membership to those original tort judgment holders who have held their judgments without satisfaction for a period not exceeding the end of the fiscal year following the fiscal year the judgment was obtained. In the case of the *Balark* plaintiffs, for example, this would mean that they would no longer be typical class representatives after December 31, 1980, since they received their judgments in 1979. After that time, a new class representative will be chosen and the Balarks can, if they choose, join the *Evans* class. Pending any legislative amendment and municipal implementation of § 9–104, we conceive a movement from the *Balark* to the *Evans* class.

We leave open for later determination the question whether a hearing is due before the end of the fiscal year the judgment is entered rather than before the end of the ensuing fiscal year. Should a hearing be due prior to a decision to not pay in the year the judgment becomes final? In order to answer that question, we must have a better sense of how the three *Matthews v. Eldridge* factors discussed above—(1) The private interest, (2) the risk of erroneous deprivation and (3) the Government's interest, including the fiscal and administrative burdens that the hearing would require—

would be implicated. We suggest that in any further briefing in this case, *i. e.*, on a motion for partial summary judgment, the parties address these considerations. If we are persuaded that the timing of the hearing should be at a point earlier than the one we have set for purposes of class definition in *Balark*, we will exercise our power under Fed.R.Civ.P. 23(c)(1) to alter or amend the class definition before a decision on the merits.

We certify the following as a (b)(2) class in *Balark*:

> All persons in whose favor a final tort judgment in excess of $1,000.00 against the City of Chicago has been or will have been entered commencing with fiscal year 1974 who have held their judgments without full satisfaction thereof for a period not greater than the end of the fiscal year following the year in which the judgment was obtained.

### Money Damages and the Evans Class

In closing, it may be helpful to consider the damages relief which may be available in *Evans* to further clarify the relationship between the three classes we have certified.

■ In *Carey v. Piphus*, 435 U.S. 247, 98 S.Ct. 1042, 55 L.Ed.2d 252 (1978), a case involving a § 1983 action brought against school officials by students who were suspended from school without procedural due process, the Supreme Court concluded that "damages awards under § 1983 should be governed by the principle of compensation...." *Id.* at 257, 98 S.Ct. at 1049. The Court said that the legislative history of § 1983 demonstrated that it was intended to create " 'a species of tort liability' " in favor of persons who are deprived of constitution-

al rights, privileges or immunities, and thus, as in tort cases, compensatory damages are central. The Court held that plaintiffs were entitled to recover nominal damages for the denial of procedural due process. Although "the denial of procedural due process should be actionable for nominal damages without proof of actual injury," a showing of actual injury resulting from the denial of due process would be required for further relief to be appropriate. *Id.* at 266, 98 S.Ct. at 1054.

As indicated by the Court in *Carey*, we must consider the issue of damages with reference to the interests protected by the particular right in question.

(1) Regarding the *Evans* class, we believe plaintiff may be able to show a twofold injury: 1) denial of right to present use and enjoyment of their property; and 2) denial of procedural due process because of defendants' failure to afford them procedural safeguards in the determination of when and how the judgments are to be paid. With respect to the first injury, full satisfaction of the judgment award according to some expedited schedule may afford appropriate compensation. With respect to the second injury, plaintiff in *Evans* may, under the rule of *Carey v. Piphus*, recover nominal damages and, to the extent actual injury is shown, actual damages.[17]

(2) Regarding the *Balark* class, the injunctive relief of procedural safeguards rather than compensatory money damages would be appropriate.

(3) Regarding the *Collum* class, the appropriate compensatory relief would be the amount of the discount plus interest thereon.[18]

---

**17.** Because of the predominance of money damages in *Evans*, 23(b)(3) is the appropriate subdivision for certification.

**18.** In addition to compensatory damages, exemplary or punitive damages may be awarded in a proper case under § 1983, with the specific purpose of deterring or punishing violations of constitutional rights. *Carey v. Piphus, supra,* 435 U.S. at 257, n.11, 98 S.Ct. at 1049, n.11. (The *Evans* complaint has specifically requested punitive damages, whereas *Balark* and *Col-*

*lum* have not.) The Seventh Circuit has stated that "[p]rovided certain aggravating circumstances are shown, punitive damages are recoverable under federal law in a § 1983 action." *Konczak v. Tyrell,* 603 F.2d 13 (7th Cir. 1979). Aggravating circumstances sufficient to sustain a punitive damage award include reckless disregard of plaintiff's rights (*Spence v. Staras,* 507 F.2d 554 (7th Cir. 1974)) or malicious intent (*Konczak, supra,* at 18).

We cannot say at this point that plaintiffs will not be able to show that defendants acted

For the foregoing reasons, defendants' motions to dismiss in *Collum* and *Balark* are denied. The *Evans* motion to redefine the *Evans* class is denied; separate classes in *Balark* and *Collum* are certified.

A status hearing is set for September 9, 1980, at 10:00 a. m. to discuss any considerations raised by our ruling today.[19]

with reckless disregard or malicious intent in delaying payment of tort judgments.

19. Matters the parties should come prepared to discuss include the mechanics of notices to the *Evans* and *Collum* classes, the advisability and extent of any jury involvement in these cases, the possibility of consolidation for trial, the advisability of motions for partial summary judgment (or whether the more expeditious course would be simply to proceed to trial), the extent of any necessary discovery that remains.